UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 21-CR-706 (JPO) |
| -v- | |
| BRIAN BENJAMIN, | OPINION AND ORDER |
| Defendant. | |

J. PAUL OETKEN, District Judge:

Defendant Brian Benjamin served as lieutenant governor of the State of New York until he resigned on April 12, 2022, the same day that the government filed a five-count indictment (the "Indictment") against him on bribery and related charges.  The Indictment alleges that Benjamin solicited and received campaign contributions from New York real estate developer Gerald Migdol and, in exchange for those contributions, allocated $50,000 in state funds to Migdol's nonprofit organization in Harlem.  Benjamin has moved to dismiss the Indictment on the ground that the government has not met the heightened legal standard for bribery and fraud charges in the particular context of a public official's fundraising for a political campaign.

For the reasons that follow, the Court concludes that the Indictment fails to allege an explicit *quid pro quo*, which is an essential element of the bribery and honest services wire fraud charges brought against Benjamin.  As a result, Defendant's motion to dismiss is granted as to the first three counts.  The Indictment is sufficient, however, with respect to the falsification-of-records charges in the fourth and fifth counts, as to which the motion to dismiss is denied.

I.      **Background**[1]

Defendant Brian Benjamin was elected to the New York State Senate in May 2017,

representing District 30.  (Dkt. No. 18 ¶ 3.)  By early 2019, Benjamin set his sights on a different

office: New York City Comptroller.  (*Id.* ¶ 6.)  In September of that year, Benjamin filed a

certification with the New York City Campaign Finance Board ("CFB") declaring his intent to

run for Comptroller and to begin raising money in connection with his Comptroller campaign.

(*Id.*)  Benjamin also indicated his intent to participate in the CFB's matching funds program,

which allowed candidates to obtain up to $8 in public funds for every $1 of eligible campaign

contributions, up to a particular amount.  (*Id.*)  Obtaining small-dollar campaign contributions

that were eligible for these matching funds would, according to the government, become a major

point of focus for Benjamin during the Comptroller campaign.  (*Id.*)

A.      **Meeting with Migdol**

Benjamin turned to Gerald Migdol, a real estate developer and District 30 constituent, as

a source of those contributions.[2]  On March 8, 2019, the two met at Migdol's home.  (*Id.* ¶ 9.)

Benjamin told Migdol that he intended to run for Comptroller and that he "wanted [Migdol] to

procure numerous small contributions for his Comptroller Campaign."  (*Id.*)  Migdol demurred,

explaining that he did not have experience bundling contributions in that manner and that his

fundraising efforts were focused on his own community non-profit, referenced in the Indictment

as Organization-1.  (*Id.*)  Further, Migdol stated that he had a "limited" ability to procure

---

[1] On a motion to dismiss, the Court reads the indictment in its entirety, *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and assumes as true all factual allegations therein. *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

[2] Migdol pleaded guilty to fraud, bribery, and other charges in this case on April 11, 2022.  (*See* Dkt. Nos. 36, 39, 40.)  The transcript of Migdol's plea allocution and the order accepting his guilty plea were unsealed on May 9, 2022.  (*See* Dkt. No. 35.)

contributions for Benjamin's campaign because any potential campaign donors were likely to be the same donors whom Migdol had solicited, and planned to solicit again, for donations to Organization-1.  (*Id.*)

In response, Benjamin stated, "Let me see what I can do."  (*Id.*)

B.     **Requesting the State Grant**

Through his position as state senator, Benjamin had the authority to request discretionary funding for organizations within his district.  (*Id.* ¶ 10.)  In February 2019, Benjamin had submitted an official request to the Senate Majority Leader listing the organizations for which he was requesting funding, which did not include Organization-1.  (*Id.*)  An entity for which Benjamin did request funding, Organization-2, was not awarded funding in the final budget allocation.  (*Id.*  ¶¶ 11-12.)

On May 30, 2019 — nearly three months after the meeting between Migdol and Benjamin at Migdol's home — Senate officials informed Benjamin and other senators that they had been awarded additional funding that they could allocate to organizations within their district.  (*Id.* ¶ 13.)  The next day, Benjamin called Migdol and told him that he intended to procure a $50,000 grant for Organization-1.  (*Id.* ¶ 14.)  The Indictment alleges that Benjamin had not previously made any effort to secure grant funding for Organization-1 and that Benjamin did not attempt to direct the newly allotted funding toward Organization-2.  (*See id.* ¶¶ 10-14.)

The State Senate approved the grant allocation on June 19, 2019.  (*Id.* ¶ 16.)  On June 20, Benjamin texted Migdol a screenshot of the Senate resolution, reflecting the $50,000 grant.  (*Id.* ¶ 17.)  They exchanged the following text messages:

> BENJAMIN:  Do you recognize the 3rd entity on the list?
>
> MIGDOL:  I do very much--does it mean what I'm hoping?

> BENJAMIN:  Oh yes it does.  We passed the resolution yesterday!
> $50k . . . I will call to discuss!

(*Id.*)

### C.    Migdol Donates to Benjamin's Senate Campaign

On July 8, 2019, Migdol met with Benjamin at his Senate district office and gave him two $10,000 checks, each in the name of one of Migdol's relatives who did not share the same last name.  (*Id.* ¶ 18.)  Migdol also gave him a $5,000 check on behalf of a limited liability company that he controlled.  (*Id.*)  These checks were made out to Benjamin's re-election campaign for State Senate, rather than the Comptroller campaign, because Benjamin would not have been permitted to raise money for the latter until he filed the CFB certification in September 2019.  But "Benjamin reminded [Migdol], in substance and in part, of the State Grant for Organization-1 and that Benjamin still expected [Migdol] to procure numerous small contributions for his Comptroller Campaign."  (*Id.*)

During the meeting, Migdol also told Benjamin information making it clear that he had made the three contributions in the names of his two relatives and the LLC to conceal any connection between himself and the contributions.  (*Id.* ¶ 19.)  Benjamin gave Migdol three blank contribution forms and directed Migdol to complete them.  In Benjamin's presence, Migdol signed the names of his relatives on the forms.  Benjamin then accepted the forms and the corresponding contributions.  (*Id.*)

### D.    Migdol Donates to Benjamin's Comptroller Campaign

By October 2019 — after Benjamin was allowed to begin accepting donations for his Comptroller campaign — he called Migdol and reiterated that he expected him to begin procuring small-dollar contributions for it.  (*Id.* ¶ 21.)  Migdol did so, providing "numerous" contributions between October 2019 and January 2021.  (*Id.* ¶ 22.)  Many of those contributions

were fraudulently submitted in the names of people who had not authorized them or who had not paid for them.  (*Id.*)  Other purported donors were reimbursed after the fact.  (*Id.*)  In February 2020, the CFB informed Benjamin's Comptroller campaign that certain of Migdol's contributions were ineligible for matching funds because they had been funded by sequentially funded money orders (among other reasons).  (*Id.* ¶ 28.)  In response, in July 2020, the Comptroller campaign represented to the CFB that some of Migdol's contributions had been procured by someone else, something Benjamin knew to be false.  (*Id.*)  During this period, the $50,000 state grant to Organization-1 had not actually been issued, and Benjamin retained the ability to alter or withdraw it.  (*Id.* ¶ 23.)  The Indictment does not allege that Migdol knew that Benjamin retained the power to alter or withdraw the grant.

Local news reports began to question the legitimacy of donations to Benjamin's Comptroller campaign and the grant was therefore never disbursed to Organization-1.  (*Id.* ¶ 24.)

### E.    Lieutenant Governorship and Concealment of the Alleged Bribery Scheme

Benjamin's campaign for New York City Comptroller ended when he lost the primary election in June 2021.  (*Id.* ¶ 7.)  In August of that year, newly installed Governor Kathy Hochul began to consider Benjamin for the position of lieutenant governor.  (*Id.* ¶ 30.)  In connection with the vetting process, Benjamin completed an executive appointment questionnaire attesting that he had never "directly exercised [his] governmental authority . . . concerning a matter of a donor [he] directly solicited" and later reiterated the same attestation in an amended questionnaire.  (*Id.* ¶¶ 30, 31.)  He also represented in the amended questionnaire that "while he regularly voted on legislation with broad implications, he was 'not aware of any specific matter that related to a particular donor.'"  (*Id.*)

### F.      Indictment

On April 12, 2022, the government filed a five-count indictment against Benjamin, alleging (1) conspiracy to commit bribery and honest services wire fraud (18 U.S.C. § 371) (Count One); (2) bribery (18 U.S.C. § 666(a)(1)(B)) (Count Two); (3) honest services wire fraud (18 U.S.C. §§ 1343 and 1346) (Count Three); (4) falsification of records relating to contributions to his Senate campaign (18 U.S.C. § 1519) (Count Four); and (5) falsification of records relating to the executive appointment questionnaire (18 U.S.C. § 1519) (Count Five).

Benjamin now moves to dismiss all five counts of the Indictment.  (*See* Dkt. No. 51.)  In the alternative, Benjamin requests that the Court compel the government to produce materials relating to its role in Migdol's plea allocution and to provide a bill of particulars specifying any additional alleged co-conspirators or bribes that it plans to use as part of its case on Count One. (Dkt. No. 53 at 5.)

## II.     The Legal Standard on a Motion to Dismiss the Indictment

The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation."  Rule 7 of the Federal Rules of Criminal Procedure implements that constitutional guarantee by requiring that the indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  FED. R. CRIM. P. 7(c)(1).  An indictment is sufficient if it: (1) contains the elements of the offense charged and fairly informs a defendant of the charge against him; and (2) allows him to plead acquittal or conviction to bar future prosecution on the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974).  In meeting these requirements, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself," but only "as long as those words of themselves fully, directly, and expressly, without any

uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881)).

The Second Circuit has stated on multiple occasions that "[t]o satisfy these requirements, an indictment need do little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021); *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). There are occasions, however, where more is required: "When 'one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense.'" *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (quoting *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996)).[3] This requirement is essential to the validity of the grand jury process: "If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury or that the grand jury acted properly in indicting him." *Pirro*, 212 F.3d at 92 (cleaned up).

The requirement that the indictment state every essential element of the crime alleged does not mean that the government must spell out absolutely everything required to be proved for an eventual conviction. "Common sense must control . . . and [a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *Stavroulakis*, 952 F.2d at 693 (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)).

---

[3] *See* WAYNE LAFAVE *et al.*, 5 CRIM. PROC. § 19.3(b) (4th ed.) (2021) ("If courts have added a significant refinement in the interpretation of a particular statutory element, that element often must be pleaded as interpreted rather than as stated in the statutory language, especially if the judicial interpretation substantially limits the scope of the statutory language.").

### III.   Counts One, Two, and Three:  *Quid Pro Quo* Bribery

Benjamin moves to dismiss Counts One, Two, and Three of the Indictment for failure to allege an explicit *quid pro quo*.  Count Two alleges bribery under 18 U.S.C. § 666(a)(1)(B) while Count Three alleges honest services wire fraud under 18 U.S.C. §§ 1343 and 1346.  Count One charges Benjamin with conspiracy to violate the statutes implicated in Counts Two and Three, under 18 U.S.C. § 371.  Benjamin argues that "to be unlawful, an alleged agreement to exchange campaign contributions for official action must be explicit:  not inferred from ambiguous statements or a chronology of events, but *explicit*, meaning actually, clearly, and unambiguously expressed by the parties."  (Dkt. No. 53 at 1.)

### A.   The Supreme Court's Decisions in *McCormick* and *Evans*

The parties agree that *McCormick v. United States*, 500 U.S. 257 (1991), provides the legal standard for *quid pro quo* bribery prosecutions involving campaign contributions, including under the statutes at issue here.[4]  (*See* Dkt. No. 53 at 25; Dkt. No. 54 at 6 n.5.) The parties

---

[4] *McCormick* dealt with extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951, which is not charged in this case.  The conclusion that *McCormick*'s reasoning applies outside of the § 1951 context has been endorsed broadly.  *See, e.g.*, *United States v. Ring,* 706 F.3d 460, 466 (D.C. Cir. 2013) ("[W]e assume without deciding . . . that *McCormick*, which concerned extortion, extends to honest-services fraud."); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act."); *United States v. Siegelman*, 640 F.3d 1159, 1169–70 (11th Cir. 2011) (applying *McCormick* to bribery charges under 18 U.S.C. § 666(a)(1)(B)); *United States v. Menendez*, 132 F. Supp. 3d 610, 623 (D.N.J. 2015) (applying *McCormick* to bribery charges under 18 U.S.C. § 201(b)); *United States v. Malone*, No. 03-CR-00500, 2006 WL 2583293, at *1 (D. Nev. Sept. 6, 2006) ("[T]he Supreme Court's reasoning in *McCormick* [is] equally applicable to charges of honest services wire fraud where the 'scheme or artifice to defraud' involved the payment of campaign contributions."); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 849 (E.D. Pa. 2018) ("Although *McCormick* involved a prosecution for Hobbs Act extortion under color of official right, courts have applied its explicit *quid pro quo* requirement to prosecutions for honest services fraud and bribery when the thing of value offered in exchange for an official act is a campaign contribution."); *United*

disagree, however, about whether and how that standard was affected by the Supreme Court's

subsequent decision in *Evans v. United States*, 504 U.S. 255 (1992).

In *McCormick*, the defendant was a member of the West Virginia House of Delegates

who received cash payments from a lobbying group, which he did not report as campaign

contributions.  After receiving the payments, he went on to sponsor legislation that eventually

passed, and which benefited the lobbying group.  After the favorable bill was enacted, the group

provided McCormick with another cash payment.  McCormick was eventually charged and

convicted of, among other things, extorting payments under color of official right in violation of

the Hobbs Act.

The Supreme Court vacated the conviction.  It held that receipt of a campaign

contribution violated the statute only if the government could prove an explicit *quid pro quo* —

that is, "only if the payments are made in return for an explicit promise or undertaking by the

official to perform or not to perform an official act.  In such situations the official asserts that his

official conduct will be controlled by the terms of the promise or undertaking."  *McCormick*, 500

U.S. at 273.  "This," the Court concluded, "defines the forbidden zone of conduct with sufficient

clarity."  *Id.*  The Court explained its concern with criminalizing common political conduct:

> Serving constituents and supporting legislation that will benefit the
> district and individuals and groups therein is the everyday business
> of a legislator. . . .  [C]ampaigns must be run and financed.  Money
> is constantly being solicited on behalf of candidates, who run on
> platforms and who claim support on the basis of their views and
> what they intend to do or have done. . . .  [T]o hold that legislators
> commit the federal crime of extortion when they act for the benefit
> of constituents or support legislation furthering the interests of some
> of their constituents, shortly before or after campaign contributions
> are solicited and received from those beneficiaries, is an unrealistic
> assessment of what Congress could have meant by making it a crime

---

*States v. Donagher*, 520 F. Supp. 3d 1034, 1043–45 (N.D. Ill. 2021) (applying *McCormick* to
campaign contribution-based bribery charges under 18 U.S.C. § 666(a)(2)).

to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion. . . .

The receipt of [political] contributions is . . . vulnerable under the Act as having been taken under color of official right, but *only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.*

*Id.* at 272-73 (emphasis added). The Court limited its holding to the campaign contribution context, stating in a footnote: "McCormick's sole contention in this case is that the payments made to him were campaign contributions. Therefore, we do not decide whether a quid pro quo requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value." *Id.* at 274 n.10.

Any momentary clarity rapidly diminished — especially after the Court's subsequent decision in *Evans v. United States*, 504 U.S. 255 (1992). *Evans* concerned the prosecution of a member of the Board of Commissioners of DeKalb County, Georgia for receiving $7,000 in cash and $1,000 in campaign contributions from an undercover FBI agent. While the question presented in *Evans* was ancillary to the legal standard for bribery in campaign contribution cases,[5] the Court appeared to shed additional light on its *McCormick* decision. Evans argued that the jury charge "did not properly describe the *quid pro quo* requirement for conviction if the jury found that the payment was a campaign contribution." *Id.* at 268. The Court rejected that argument and approved of the jury instruction, which stated in part:

---

[5] The question presented in *Evans* was whether the Hobbs Act required the defendant to have affirmatively induced the bribe payment, or whether passive acceptance of the payment was sufficient. 504 U.S. at 267.

> The defendant contends that the $8,000 he received from agent Cormany was a campaign contribution. The solicitation of campaign contributions from any person is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to political office. Thus, the acceptance by an elected official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.
>
> However, if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution.

*Id.* at 258-59.  The Court clarified that under *McCormick*, the object of the *quid pro quo* agreement need not be fulfilled for the offense to be complete; the offense is complete as soon as the official receives payment for his agreement to perform the official act.  *Id.* at 268.  Finally, the Court held that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  *Id.*

*McCormick* and *Evans* thus present two distinct definitions of *quid pro quo*: A *quid pro quo* under *McCormick* must involve a payment made in return for an "explicit promise or undertaking."  A *quid pro quo* under *Evans* can be proven inferentially, based on the implication that an official has knowingly accepted a payment intended to compensate him for an official act.

The lower courts have had a difficult time in parsing how *McCormick* and *Evans* relate to one another.  *See United States v. Blandford*, 33 F.3d 685, 695 (6th Cir. 1994) ("Exactly what effect *Evans* had on *McCormick* is not altogether clear."); *United States v. McGregor*, 879 F. Supp. 2d 1308, 1316–17 (M.D. Ala. 2012) (collecting cases and explaining that "there is considerable debate over what *McCormick* [and] *Evans* . . . require. . . . The Circuit Courts of Appeals have struggled with these questions.").  The cases raise two pertinent questions: (1)

Does *Evans*, a case involving a $7,000 cash bribe and $1,000 in campaign contributions, apply to cases where the bribery allegations are entirely based on campaign contributions? And (2) how "explicit" does *McCormick* require a *quid pro quo* to be?  *See United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) ("The *McCormick* Court failed to clarify what it meant by 'explicit,' and subsequent courts have struggled to pin down the definition of an explicit quid pro quo in various contexts."); *McGregor*, 879 F. Supp. 2d at 1314 (M.D. Ala. 2012) ("The definition of 'explicit' remains hotly contested.").

### B.   Second Circuit Decisions Applying *McCormick* and *Evans*

Though the Second Circuit has not yet had occasion to decide a case alleging bribery in the form of campaign contributions, it has offered its own interpretation of the meaning of *McCormick* and *Evans*.  It first did so in *United States v. Garcia*, 992 F.2d 409 (1993), where it stated clearly that *Evans* provides the legal standard in non-campaign contribution cases:

> Although the *McCormick* Court had ruled that extortion under color of official right in circumstances involving campaign contributions occurs "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," . . . *Evans* modified this standard in *non-campaign contribution cases* by requiring that the government show only "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."

*Garcia*, 992 F.2d at 414 (emphasis added) (quoting *Evans*, 504 U.S. at 268).

The Second Circuit returned to *McCormick* and *Evans* in *United States v. Ganim*, 510 F.3d 134 (2007) (Sotomayor, J.).  The court first noted that *McCormick* had "considered the requirements for an extortion conviction under color of official right in the special context of campaign contributions."  *Id.* at 142.  After reciting the *McCormick* standard — that "payments are made in return for an explicit promise or undertaking by the official to perform or not to

perform an official act" — the Court stated that "proof of an express promise is necessary when the payments are made in the form of campaign contributions." *Id.* at 142.

The *Ganim* court next made clear that *Garcia* had "harmonized" the tension between *McCormick* and *Evans*. *Id.* at 143. While proof of a *quid pro quo* is required to sustain a conviction in campaign contribution and non-campaign contributions alike, *Evans* modified the standard in the latter:

> Drawing from Justice Kennedy's concurrence in *Evans*, we found that a *quid pro quo* was required to sustain a conviction in the non-campaign context, but that the agreement may be implied from the official's words and actions because "'otherwise the law's effect could be frustrated by knowing winks and nods.'"

*Id.* (quoting *Garcia*, 992 F.3d at 414 (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring)).

Subsequent Second Circuit cases — albeit none involving bribery in the form campaign contributions — have confirmed that the court interprets *Evans* to have modified the standard of proof solely in non-campaign contribution cases. *See United States v. Silver*, 948 F.3d 538, 548 (2d Cir. 2020) (quoting *Garcia*, 992 F.2d at 414 ("The Court modified *McCormick*'s 'explicit promise' standard in non-campaign contribution cases.")); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013) ("Outside the unique context of campaign contributions . . . we have not, in the context of bribery cases, required proof of an express promise regarding the specific official acts to be undertaken as part of the exchange.").

The government hotly contests this circumscribed application of *Evans*. In its view, the less-stringent *Evans* standard applies equally to campaign contribution cases: After all, the defendant in *Evans* was convicted in part for accepting $1,000 in campaign contributions. (*See* Dkt. No. 54 at 7, 10.) The trial court had instructed the jury that the defendant believed the $8,000 he received from the FBI agent to be a campaign contribution. (*Id.* at 10-11.) And

Justice Kennedy, in his concurrence in *Evans*, referred to the underlying prosecution as one "in which it is alleged that money was given to the public official in the form of a campaign contribution."  504 U.S. at 277 (Kennedy, J., concurring).

It is unclear, however, whether *Evans* is best read as limiting or overruling McCormick's "explicit *quid pro quo*" standard in the context of campaign contributions.  The Court granted certiorari in *Evans* to resolve an issue orthogonal to the question of the *quid pro quo* standard for bribes involving campaign contributions, and the majority did not purport to overrule or alter the standard in *McCormick* for campaign contribution cases.  *See United States v. McGregor*, 879 F. Supp. 2d 1308, 1318 (M.D. Ala. 2012) (Thompson, J.) ("[T]he Court's discussion of the quid pro quo standard [in *Evans*] was tangential to the decision.").  Moreover, the majority opinion in *Evans* largely focuses on the $7000 cash payment, which, according to the jury's findings, was *not* a campaign contribution.  *See United States v. Evans*, 910 F.2d 790, 798 n.10 (11th Cir. 1990).

But regardless of the merits of the parties' arguments on how best to reconcile *McCormick* and *Evans*, the Second Circuit has already answered the question.  The government is not able to rebut the Second Circuit's clear pronouncements that "*Evans* modified [the *McCormick*] standard in non-campaign contribution cases," *Garcia*, 992 F.2d at 414, and that "proof of an express promise is necessary when the payments are made in the form of campaign contributions," *Ganim*, 510 F.3d at 142.  The government calls these statements "clearly incorrect," citing commentary from other courts that the Second Circuit has propounded an erroneous interpretation of *Evans* based on a misreading of the factual background of that case. (Dkt. No. 54 at 11 n.7 (citing *McGregor*, 879 F. Supp. 2d at 1318).  Unless and until the Second Circuit expresses a different view, however, this reading of *Evans* controls.  This Court is not

free to disregard the Second Circuit's considered interpretation of Supreme Court precedent on the theory that it is "incorrect."

The government also tries a different angle, emphasizing that neither *Garcia* nor *Ganim* concerned campaign contributions, making their pronouncements on the *McCormick* and *Evans* standards dicta.  (Dkt. No. 54 at 11 n.7, 13.)  As Benjamin notes, however, *Ganim*'s holding was premised on Second Circuit precedent, derived primarily from *Garcia*, that non-contribution cases were to use the *Evans* standard.  (Dkt. No. 54 at 12-13.)  To articulate the standard for non-contribution cases, the court necessarily had to explain the standard in place for contribution cases.  The *Ganim* and *Garcia* courts' rulings on the standard for contribution cases can therefore be understood as reasoning necessary to reach their holdings, and thus not dicta.

But even if those rulings are dicta, they are the type of dicta that should be given great weight by district courts in the Second Circuit.  *See United States v. Oshatz*, 912 F.2d 534, 540 (2d Cir. 1990) ("[I]n some contexts expressions of views by an appellate court must be regarded as the law of the circuit, even though not an announcement of a holding or even of a necessary step in the reasoning leading to a holding."); *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 209 (E.D.N.Y. 2007) ("[A]s a general principle, a federal district court is required to give great weight to the pronouncements of its Court of Appeals, even though those pronouncements appear by way of dictum.").  The conclusion that *Evans* modified the standard for non-contribution cases has now been repeated not only in *Ganim* and *Garcia* but in two other Second Circuit cases.  *See United States v. Silver*, 948 F.3d 538, 548 (2d Cir. 2020); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013).  Particularly in the context of a criminal case, ignoring repeated and clear — indeed, explicit — rulings by the Second Circuit on the legal standard governing criminal liability for campaign contributions would be inappropriate as well as unfair.

### C.      The Meaning of *McCormick*'s "Explicit" Requirement

Having concluded that the *McCormick* standard, and not the *Evans* standard, applies in campaign contribution cases in the Second Circuit, the Court turns to how, precisely, to interpret it.  In other words, if an unlawful *quid pro quo* exists "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," *McCormick*, 500 U.S. at 273, how explicit does the promise or undertaking have to be?

The Second Circuit has unfortunately not supplied a clear definition of "explicit."  The closest it came to shedding light on the term was in *Ganim*, where it stated that "proof of an *express* promise is necessary when the payments are made in the form of campaign contributions."  *Ganim*, 510 F.3d at 134 (emphasis added).  By substituting the word "express" in characterizing the *McCormick*'s "explicit" *quid pro quo* standard, the court certainly suggested that "explicit" and "express" are synonyms (or at least something very close).[6]

What, then, is the meaning of an explicit or express promise?  Logic requires beginning with the distinction the Second Circuit has drawn between the *Evans* standard for non-campaign contribution cases and the *McCormick* standard for campaign contribution cases.  *Evans* allows the government to prove its case by implication: "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  *Evans*, 504 U.S. at 268.  In other words, an "agreement may be

---

[6] In contrast, some courts have read *McCormick* as imposing a lower standard than its language suggests by drawing a distinction between the meaning of "explicit" and "express," concluding that *McCormick*'s "explicit" standard requires something less than an "express" *quid pro quo*.  *See United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011); *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994); *United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018).  This approach does not find support in the Second Circuit's *Ganim* opinion, which treated the terms as synonymous.  And it hardly seems persuasive as a matter of ordinary English-language usage:  the phrase "explicit promise" is essentially synonymous with the phrase "express promise."

implied from the official's words and actions."  *Ganim*, 510 F.3d at 134.  It follows that if the

Second Circuit permits non-campaign contribution *quid pro quo* prosecutions to rely on proof by

implication, then the explicit/express requirement for contribution cases requires something

more.

      In other words, if one thing is clear, it is that an "explicit" promise cannot be satisfied by

implication, as it would be contradictory to hold that a *quid pro quo* agreement could be

simultaneously "explicit" and "implicit."  *Compare Implied*, BLACK'S LAW DICTIONARY (11th

ed. 2019) (defining "implied" as "[n]ot directly or clearly expressed; communicated only

vaguely or indirectly," or "[r]ecognized by law as existing inferentially"), *with Explicit*, BLACK'S

LAW DICTIONARY (defining "explicit" as "[c]lear, open, direct, or exact" or "[e]xpressed without

ambiguity or vagueness; leaving no doubt") *and Express*, BLACK'S LAW DICTIONARY (defining

"express" as "[c]learly and unmistakably communicated; stated with directness and clarity").

      Indeed, such a distinction is supported by Justice Kennedy's concurrence in *Evans*, which

distinguished between an "express" agreement and one "implied from words and actions."

*Evans*, 504 U.S. at 274 ("The inducement from the official is criminal if it is express or if it is

implied from his words and actions.") (Kennedy, J., concurring).  This reading is also bolstered

by a contextual look at Justice Stevens' dissent in *McCormick*, which expressed disapproval of

what he saw as the Court's requiring that a campaign contribution *quid pro quo* be made

"explicit rather than implicit" — that is, that the illegal agreement be made "in a particular

form." *McCormick*, 500 U.S. at 282 (Stevens, J., dissenting).  Instead, Justice Stevens argued

that there need only be a "mutual understanding" that the payment was made in return for the

official's conferring a benefit or avoiding a harm to the payer.  *Id.* at 283.  Only a year later, the

*Evans* Court appeared to take Justice Stevens' proposed standard, or one very close to it, and

adopt it as a new rule — with Justice Stevens writing for the majority.  But based on *Garcia* and
*Ganim*, the Second Circuit holds that that rule applies only in the context of non-campaign-
contribution cases.  Thus, the *McCormick* standard does not allow for a conviction based only on
proof of "implicit" agreements.

The government argues that the "explicit" requirement cannot be read to mean that a *quid
pro quo* must be "stated or transcribed," due to the perverse incentive created when bribery
charges can be brought only against "elected officials careless enough to state or transcribe the
contours of their crime."  (Dkt. No. 54 at 10, 16.)  This is essentially the same objection that
Justice Stevens raised in his dissent in *McCormick*.  Whatever its merits as a policy argument,
"*the Court can't really have meant explicit*" is not persuasive as a matter of legal interpretation.

But the government's point begs the question whether the meaning of an "explicit" *quid
pro quo* is necessarily as narrow as "stated or transcribed" (in the government's words) (*id.*), or
"actually, clearly, and unambiguously expressed by the parties" (in Benjamin's words) (Dkt. No.
53 at 1).  It is true that the ordinary meaning of "explicit" is something like "expressed without
ambiguity or vagueness."  BLACK'S LAW DICTIONARY, *supra*; *accord Explicit*, MERRIAM
WEBSTER DICTIONARY (2022) ("fully revealed or expressed without vagueness, implication, or
ambiguity").  There might arguably be a secondary meaning of "explicit," however, that is
simply "clear and unambiguous" — not necessarily including the notion of "expressed."
Apparently adopting this understanding, the Ninth Circuit has held that "what *McCormick*
requires is that the *quid pro quo* be clear and unambiguous, leaving no uncertainty about the
terms of the bargain."  *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992); *accord
United States v. Donagher*, 520 F. Supp. 3d 1034, 1045 (N.D. Ill. 2021) (quoting *Carpenter*, 961
F.2d at 826 ("An explicit *quid pro quo* must 'be clear and unambiguous, leaving no uncertainty

about the terms of the bargain.'")).  The problem with this interpretation is that it would seemingly encompass a *quid pro quo* that is entirely *implicit* — that is, based on unspoken assumptions, winks and nods — so long as the terms of the bargain were "clear and unambiguous" to the parties themselves.  If that is all that is meant by an "explicit" *quid pro quo*, then there would appear to be little or no difference between the *McCormick* standard and the *Evans* standard (and little or no reason for Justice Stevens to have dissented in *McCormick*).

Perhaps the best evidence of the meaning of *McCormick*'s "explicit" *quid pro quo* comes from the facts of *McCormick* itself.  Whatever an "explicit" *quid pro quo* might entail, it must be more explicit than the exchange in *McCormick* — in which the Court reversed the conviction for lack of a sufficiently "explicit" *quid pro quo*.  The basic structure of the exchange in *McCormick* is analogous to that alleged in this case.  In *McCormick* (as here), there is a clear *quid* (contributions to the politician's campaign); a clear *quo* (in *McCormick*, sponsoring particular legislation favorable to the lobbyist's clients), and circumstantial evidence supporting a *pro* — i.e., a direct connection between the two — including even one party's promise to "see what he could do."[7]  There is really no question that the *quid* and the *quo* were clear and unambiguous. *McCormick*'s point was that the *pro* itself must be clear and unambiguous — and characterized

---

[7] The facts in *McCormick* were as follows:  (1) Robert L. McCormick, a Virginia legislator, met with a lobbyist to discuss the possibility of introducing certain legislation that would be favorable to the foreign doctors the lobbyist represented, and agreed to sponsor it; (2) McCormick informed the lobbyist "that his campaign was expensive, that he had paid considerable sums out of his own pocket, and that he had not heard anything from the foreign doctors"; (3) the lobbyist told McCormick "that he would contact the doctors and see what he could do"; (4) that same day the lobbyist delivered $2,900 in cash to McCormick, and he delivered two more cash payments later that year; (5) McCormick thereafter sponsored and actively supported the favorable legislation, which was ultimately enacted into law; (6) two weeks after the legislation was enacted, McCormick received another cash payment from the foreign doctors.  *McCormick*, 500 U.S. at 260.

by more than temporal proximity, winks and nods, and vague phrases like "let me see what I can do."

The government offers another plausible interpretation that would lighten the burden of *McCormick*'s "explicit" standard while also maintaining a distinction between that standard and the *Evans* standard for a *quid pro quo* in non-campaign-contribution cases.  The latter standard, it argues, allows for a *quid pro quo* where the *quo* is not a single *specific* official act — that is, where an official commits to benefiting the payor with official acts "as opportunities arise." (Dkt. No. 54 at 11.)  On this view, the *McCormick* standard for campaign-contribution cases is limited to a particular *quid* (contribution X) being exchanged for a particular *quo* (official act Y), and that is what makes the *quid pro quo* "explicit."  The Second Circuit did approve of the "as opportunities arise" theory of bribery in *Ganim*, 510 F.3d at 147, and there is language that arguably supports this distinction in other cases, all similarly involving non-campaign contributions.  *See United States v. Silver*, 948 F.3d 538, 566 (2d Cir. 2020); *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013); *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993).

While this argument has some force, it ultimately fails.  First, *McCormick* itself involved a particular *quid* for a particular *quo*.  If that feature — an exact exchange between a specific quid and a specific quo — is all that is necessary to make a *quid pro quo* "explicit," then the Supreme Court would have affirmed the conviction rather than reversing.  Second, the government's interpretation of "explicit" on this theory remains fairly idiosyncratic.  As discussed above, "explicit" ordinarily means "clearly expressed" or at least "clear and unambiguous."  But one could easily have a clear, unambiguous agreement for an elected official to benefit a contributor "as opportunities arise."  It seems unlikely that the Second Circuit — and the Supreme Court in *McCormick* — had no more in mind than the need for "the specific

transactions comprising the illegal scheme to match up this for that," *Ganim*, 510 F.3d at 147, when using the words "explicit" and "express" to describe the kind of *quid pro quo* exchanges for campaign contributions that are criminalized by the federal bribery and extortion statutes.[8]

It does not necessarily follow, however, that a *quid pro quo* agreement must be "stated or transcribed" in order to be "explicit."   Consider the following two hypothetical scenarios:[9]

> *Scenario 1:*  Mayor Doe tells businesswoman Jones that he will award her company a contract if she donates $5,000 to his campaign. Jones says, "That sounds great to me." She sends a check for $5,000 the next day.

> *Scenario 2:*  Mayor Doe tells businesswoman Jones that he will award her company a contract if she donates $5,000 to his campaign. Jones smiles, shakes the Mayor's hand, and leaves. She sends a check for $5,000 the next day.

Scenario 1 is an explicit agreement shown through oral statements:  the terms of the exchange are clear and unambiguous; the *quid* and the *quo* are conditioned on each other; and Jones's words constitute an acceptance of Mayor Doe's explicit offer.  Scenario 2 is an explicit

---

[8] The court in *Ganim* explained that its conclusion as to the validity of the "as opportunities arise" theory was "a natural *corollary* of *Evans*' pronouncement that the government need not prove the existence of an explicit agreement at the time a payment is received."  510 F.3d at 144-45 (emphasis added).  A corollary is a conclusion that follows from a given set of premises, not simply a restatement of the premises themselves.  Though the fact that a non-campaign-contribution *quid pro quo* need not be "explicit" might carry the corollary consequence that it can be proved without demonstrating a link between a specific benefit and a specific act, it does not necessarily follow that *all* that is conveyed by the "explicit/non-explicit" distinction is the necessity or not of proving such a specific link.

[9] These scenarios are modified versions of those in Judge Myron Thompson's thoughtful discussion of these issues in *United States v. McGregor*, 879 F. Supp. 2d 1308, 1317-18 (M.D. Ala. 2012).  This Court's analysis is somewhat different than that of Judge Thompson due primarily to the differences between the Second Circuit's and Eleventh Circuit's governing case law.

agreement shown by *conduct*.  That is because the solicitation by Mayor Doe is explicit in its terms and Jones's conduct is fairly viewed as acceptance.

Of course, things get more complicated from here, particularly in situations where (1) there is neither an explicit solicitation (by the official) nor an explicit promise (by the donor) conditioning the *quid* and the *quo* upon each other; (2) there is a significant passage of time between the two events without any clear and contemporaneous meeting of minds; and/or (3) the donation or the official act might be based on mixed motives — such as where an official views the official act as good policy that he would have taken even absent the donation.  Consider the following additional scenarios:

> *Scenario 3:*  Businesswoman Jones and Mayor Doe never meet. But Businesswoman Jones is hoping that the city will award her company a contract, so she donates $5,000 to Mayor Doe.  Six months later Mayor Doe awards her company a contract.
>
> *Scenario 4:*  Businesswoman Jones meets Mayor Doe at an event. She tells him:  "I like what you've been saying about helping small businesses.  I have a great company and we would love to work with the city."  He tells her that he "would appreciate her support." The next day Jones sends Doe a check for $5,000.  Six months later Mayor Doe awards her company a contract.
>
> *Scenario 5:*  Businesswoman Jones meets Mayor Doe at an event. She tells him: "I like what you've been saying about helping small businesses.  I have a great company and we would love to work with the city."  He tells her: "I would appreciate your support.  By the way, if you send over a draft contract I'll take a look and see what I can do."  The next day Jones sends Doe a check for $5,000. Six months later Mayor Doe awards her company a contract.

Scenario 3 plainly does not constitute a *quid pro quo*:  there is no agreement at all, much less one conditioning the *quid* on the *quo*; and since there is no communication before the donation, the donation cannot even arguably have been "conditioned" on the official act.  Scenario 4 also probably does not constitute a *quid pro quo*:  it would be a stretch to say that even an implicit

agreement is created by the parties' words and conduct here (even if one of the reasons Mayor Doe ultimately awards the contract is his appreciation for the donation). And Scenario 5 involves at most an implicit agreement because the terms of the *quid* (the amount of the donation) are not clear and unambiguous in advance; nor is there a simultaneous meeting of minds that the donation and official act are conditioned on each other. One might argue that in Scenario 5 (and perhaps even 4), it should be a jury question whether Mayor Doe reached an agreement with Businesswoman Jones after he received her check — when he presumably decided whether $5,000 was enough to justify awarding the contract. Then the jury would have to decide whether Mayor Doe in fact awarded the contract because of the donation (and presumably in the hopes of future donations), or instead because he liked the company, or was impressed by Jones, or for some other reason. But it is those questions that make the possible *quid pro quo* in Scenario 5 implicit rather than explicit.

The Court concludes that, for criminal liability for bribery in the context of campaign contributions, there must be a *quid pro quo* that is clear and unambiguous, meaning that (1) the link between the official act and the payment or benefit — the *pro* — must be shown by something more than mere implication, and (2) there must be a contemporaneous mutual understanding that a specific *quid* and a specific *quo* are conditioned upon each other.

D.      **Constitutional Considerations**

The Court is mindful that a defendant seeking dismissal of an indictment "faces a high hurdle." *United States v. Silver*, 117 F. Supp. 3d 461, 464 (S.D.N.Y. 2015) (Caproni, J.). In this case, the Court's analysis and conclusion are informed by two important constitutional protections: the First Amendment and the Due Process Clause of the Fifth Amendment.

### 1.     First Amendment

First, the Court must consider the Indictment in the larger context of the Supreme Court's rulings on the First Amendment and campaign finance.  The Court has made clear on numerous occasions that campaign contributions are political speech implicating fundamental constitutional guarantees.  *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 204 (2014) (characterizing campaign contributions as an exercise of one's "expressive and associational" rights under the First Amendment); *Buckley v. Valeo*, 424 U.S. 1, 24–25 (1976) (observing that campaign contributions implicate "the contributor's freedom of political association" under the First Amendment).  The Court reiterated this point just this past Term, stating that "[t]he First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'"  *Fed. Election Comm'n v. Cruz*, 142 S.Ct. 1638, 1650 (2022) (quoting *Monitor Patriot Co. v. Roy*, 401 U. S. 265, 272 (1971)).

Because campaign contributions implicate the very foundations of the American democratic system, the *McCormick* Court was careful to delineate the boundary between permissible and impermissible conduct when public officials are raising money from the same people they are elected to represent:  "Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right.'"  500 U.S. at 272.  Instead, sanctionable conduct must cross a clear line of impropriety, because "[t]o hold otherwise would open to prosecution not only conduct that has long been thought to be well

within the law but also conduct that in a very real sense is unavoidable so long as election

campaigns are financed by private contributions . . . ." *Id*.

An official act taken in the hope that it will yield campaign contributions is not a bribe; it

is a basic aspect of the American political system.  This is a fine distinction, but an essential one:

> [I]nfluence and access "embody a central feature of democracy—
> that constituents support candidates who share their beliefs and
> interests, and candidates who are elected can be expected to be
> responsive to those concerns." . . . To be sure, the "line between quid
> pro quo corruption and general influence may seem vague at times,
> but the distinction must be respected in order to safeguard basic First
> Amendment rights."

*Cruz*, 142 S.Ct. at 1653 (quoting *McCutcheon*, 572 U.S. at 192, 209 (2014)).

To be sure, the mere fact that First Amendment protections are implicated by a

prosecution does not render that prosecution invalid.  *See, e.g.*, *United States v. Smith*, 985 F.

Supp. 2d 547, 605 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23

(2d Cir. 2016) ("Just because this alleged *quid pro quo* arrangement involved political-party

officials, they are not entitled to immunity for their actions under the guise of protected

speech.").  This is a case where First Amendment principles are not tangential to the validity of

the prosecution, but rather central to it.  In drawing the line between *quid pro quo* corruption and

general influence, "the First Amendment requires [the Court] to err on the side of protecting

political speech rather than suppressing it."  *McCutcheon*, 572 U.S. at 209 (quoting *Federal*

*Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 457 (2007)).

## 2.    The Fair Warning Requirement of Due Process

The Supreme Court has also made clear that principles of due process require "fair

warning . . . in language that the common world will understand" as to what conduct is

prohibited by law.  *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.).  There are

"three manifestations of the fair warning requirement":  the vagueness doctrine; the rule of

lenity; and, pertinent here, the principle that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 267, 266 (1997). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*. at 267.

As explained above, there is confusion among the courts about whether the *McCormick* standard applies to campaign-contribution cases and about what its "explicit" standard means. Moreover, while the Second Circuit has not decided a bribery case that was actually based on campaign contributions, the court has clearly stated, repeatedly and explicitly, that a *quid pro quo* in this context must be "explicit" or "express." It has not further explained what that standard means. At a minimum, the governing precedents were not clear enough to give Benjamin "fair notice of what behavior [was] criminal," *Sash v. Zenk*, 428 F.3d 132, 134 (2d Cir. 2005), at the time he acted. To impose — or even charge — criminal liability in the Second Circuit where the conduct did not clearly involve an "explicit" *quid pro quo* would create a significant fair-warning problem. These considerations weigh in favor of a stricter interpretation of the "explicit" *quid pro quo* requirement.

###### E.   Application to the Indictment

####### 1.   Failure to Charge an Essential Element

Applying the principles laid out above, the Court concludes that the Indictment fails to charge an explicit *quid pro quo*. As noted above, the government was required not just to track the language of each relevant statute, but also to explicitly allege any implicit element of each statute. Here, the bribery statute (18 U.S.C. § 666(a)(1)(B)) and honest services wire fraud statute (18 U.S.C. §§ 1343 and 1346) do not, on their face, contain any requirement to show an explicit *quid pro quo* agreement. But an explicit *quid pro quo* is an "implicit element" of each

statutory offense charged here, given that through *McCormick* and its Second Circuit progeny, the "courts have added a significant refinement" in how these statutes may be interpreted against public officials facing prosecution over campaign fundraising.  *See Pirro*, 212 F.3d at 86; LAFAVE *et al.*, *supra*, § 19.3(b).  The Second Circuit has held — again, explicitly — that "proof of an express promise is necessary when the payments are made in the form of campaign contributions."  *Ganim*, 510 F.3d at 142.  If the government must prove the existence of an explicit or express promise to sustain a conviction, then it constitutes an essential element of the crime that must be alleged in the indictment.  Otherwise, there is no assurance that the grand jury considered that essential element.  In *United States v. Donagher*, 520 F. Supp. 3d 1034 (N.D. Ill. 2021), Judge John Z. Lee dismissed an indictment's federal bribery charges on precisely this ground.  As he explained:

> [E]nsuring that the grand jury considered the explicit *quid pro quo* element in the context of campaign contributions is anything but a technicality; to the contrary, given the controlling law, doing so is necessary to shield ordinary, constitutionally protected campaign financing activities from criminal prosecution.

*Id*. at 1046 (citing *McCormick*, 500 U.S. at 271-73).

With this understanding in mind, Counts One, Two, and Three of the Indictment must be dismissed because it does not allege as an element of any of the three counts that Benjamin made an "explicit" agreement with Migdol that his conduct as a state senator would be controlled in exchange for campaign contributions.  To be sure, the indictment contains phrases that gesture toward an agreement, most convincingly at:

- Paragraph 1: "From at least in or about 2019, up to and including at least in or about 2021, Brian Benjamin, the defendant, participated in a scheme to obtain campaign contributions from a real estate developer [Migdol] *in exchange for* Benjamin's agreement to use, and actual use of, his official authority and influence as a New York State senator to obtain a $50,000

grant of state funds [for Organization-1]."  (Dkt. No. 18 ¶ 1) (emphasis added).

- Paragraph 40: "Benjamin solicited and received campaign contributions from [Migdol] *in exchange for* Benjamin's agreement to use, and actual use of, his official authority and influence to obtain the State Grant for Organization-1."  (*Id.* ¶ 40) (emphasis added).

In its opposition brief, the government insists that the "in exchange for" phrasing satisfies the explicit requirement under *McCormick* and *Ganim*.  (Dkt. No. 54 at 5-6.)  It does not.  An indictment relying on an implicit statutory element must allege it explicitly.  *Pirro*, 212 F.3d at 93.  To do so, it follows that the government must directly state the implicit element — or a direct synonym for it — in the indictment.  "In exchange for" is not synonymous with explicit or express.  A person gives something "in exchange for" something else in any *quid pro quo*, whether an explicit *quid pro quo* under *McCormick* or an implicit *quid pro quo* under the *Evans* standard for non-campaign-contribution cases.  Indeed, this is evident from cases like *Ganim* and *Coyne*, where "in exchange for" was used in the jury instructions where the defendant was charged with bribery that was not based on campaign contributions.  *See Ganim*, 510 F.3d at 144 ("Both parties appear to agree that the language in the first paragraph [of the jury instructions]— requiring that the defendant know 'that the payment was made in return for official acts,' and 'that the payment was made in exchange for a specific exercise of the defendant's official powers' — accurately portrays the applicable *quid pro quo* standard."); *accord United States v. Coyne*, 4 F.3d 100, 113–14 (2d Cir. 1993).

The Court recognizes that "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made."  *Stavroulakis*, 952 F.2d at 693 (citing *Silverman*, 430 F.2d at 111).  But the existence of an exchange or agreement does not necessarily imply the existence of an explicit or express agreement.  The use of "exchange" was thus

insufficient to fully apprise the grand jury of a necessary element of Counts Two and Three (and, therefore, Count One, which charges a conspiracy to commit the latter two counts).[10]  *See Pirro*, 212 F.3d at 92; *Donagher*, 520 F. Supp. at 1046.

Aside from the particular phrasing above, the government argues that an explicit *quid pro quo* can be "inferred from a course of conduct or the surrounding circumstances," including the timing of Benjamin and Migdol's interactions.  (*See* Dkt. No. 54 at 8; Dkt. No. 64 at 27.)  Here, the government cites out-of-circuit precedent for the proposition that "[e]xplicit, as explained in *Evans*, speaks not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated."  (Dkt. No. 54 at 9, quoting *Blandford*, 33 F.3d at 686).  This argument fails for the reasons outlined above.  While inferences drawn from Benjamin's course of conduct would be sufficient to satisfy the *Evans* standard, they are not sufficient to satisfy *McCormick*'s "explicit" requirement, as interpreted by the Second Circuit in *Garcia* and *Ganim*.  While the government cites cases that bolster its view that *Evans* applies here, those lines of authority are in conflict with the relevant guidance from the Second Circuit.  *Compare Blandford*, 33 F.3d at 696 ("*Evans* provided a gloss on the *McCormick* Court's use of the word 'explicit' to qualify its *quid pro quo* requirement. . . . Our reading of *Evans* — as limited to the campaign contribution context — is bolstered by the fact that the case, after all, involved campaign contributions.") *with Garcia*, 992 F.2d at 414 ("*Evans* modified [the *McCormick*] standard in non-campaign contribution cases . . . .").

---

[10] This is also the case for the places where the indictment alleges an agreement between Benjamin and Migdol. *E.g.*, Dkt. No. 18 ¶ 38 ("Benjamin . . . corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, something of value from a person, intending to be influenced and rewarded . . . .").

Bound by guidance from the Second Circuit, the Court concludes that Counts One, Two, and Three of the Indictment must be dismissed for failure to charge an essential element.

### 2.   Failure to Allege a Crime

Although presenting a closer question, the Court also agrees with Benjamin's separate but related argument that the facts alleged in the Indictment, even if true, fail to establish criminal liability as to these counts.  (Dkt. No. 53 at 17-18.)  The government's recitation of the timeline of events between Benjamin and Migdol does not allege the existence of any agreement between the two at the time that Benjamin procured the $50,000 in state funding for Organization-1.  The Indictment therefore fails to allege any offense under the statutes, as interpreted through the lens of *McCormick*.

The Second Circuit has set constraints on the Court's consideration of the alleged facts at this stage of the proceedings:  "[A]lthough a judge may dismiss a civil complaint pretrial for insufficient evidence, a judge generally cannot do the same for a federal criminal indictment." *United States v. Sampson*, 898 F.3d 270, 280 (2d Cir. 2018).  As a result, "when a defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion."  *Id.* at 281.

But the issue here is more than a factual dispute — it goes to whether the government has properly alleged that any criminal offense occurred.  "Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."  *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (citing *Dowling v. United States*, 473 U.S. 207, 213 (1985) (holding indictment insufficient where allegation that defendant stole digital property did not allege a crime under the relevant statute) (cleaned up)); *see also Pirro*, 212 F.3d at 92-93 (dismissing tax fraud and perjury counts because conduct alleged in indictment did not violate applicable statute); *United*

*States v. Heicklen*, 858 F. Supp. 2d 256, 275–76 (S.D.N.Y. 2012) (dismissing indictment where facts alleged did not constitute the crime of attempting to influence the actions of a juror); *United States v. Kerik*, 615 F. Supp. 2d 256, 271–74 (S.D.N.Y. 2009) (dismissing false-statement charge based on allegations in the indictment because defendant's alleged failure to disclose information in response to a question that the court determined was "fundamentally ambiguous" was not a crime as a matter of law).

The courts have not always distinguished these two legal issues:  the requirement that an indictment allege all the essential elements of the crime and the requirement that the facts alleged in an indictment constitute an offense.  But they are distinct questions.  *See Heicklen*, 858 F. Supp. 2d at 262 ("[A]n indictment that alleges the essential elements of the crime and states specific facts indicating at least the time and the place of the alleged offense is generally sufficient.  In this case, however, the basis for the motion to dismiss the Indictment is neither a pretrial challenge to the evidence nor a claim that the indictment is not pled with sufficient specificity, but rather is an argument that the facts alleged do not constitute an offense as a matter of law.").

*McCormick* holds that an elected official's acceptance of campaign contributions is sanctionable "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.  In such situations the official asserts that his official conduct *will be controlled* by the terms of the promise or undertaking."  500 U.S. 257, 273 (emphasis added).  The second sentence is key to understanding the limits of the *McCormick* rule:  the explicit agreement must precede the official conduct.

The timeline of events set forth in the Indictment does not meet this basic requirement of *McCormick*:  At the end of the March 8, 2019 meeting, after Benjamin asked Migdol to help him

31

bundle small-dollar campaign contributions, Migdol demurred, explaining why he could not do what Benjamin had requested.  Benjamin then responded, "Let me see what I can do."  Up to this point, there was no agreement because Migdol had not communicated any intent to do what Benjamin asked or to ask for something in return.  The next key date was May 31, 2019, when Benjamin informed Migdol that he planned to obtain the $50,000 grant.  The Indictment still does not allege any response from Migdol to this offer, and certainly no explicit promise that Benjamin would obtain the grant money only if Migdol would later pay him campaign contributions.  On June 3, 2019, Benjamin submitted the official request form for the grant allocation — having made no explicit agreement with Migdol that controlled the terms of this action.

The government contests this line of reasoning.  (See Dkt. No. 54 at 8.)  The bulk of its rebuttal relates back to its argument that a *quid pro quo* in campaign contribution cases can be "inferred from an ongoing course of conduct" and "is criminal if it is express or if it is implied from . . . words and actions, so long as [an elected official] intends it be so and the [bribe] payor so interprets it."  (*Id.* at 14-15 (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment))).  It may be true that, under *Evans*, a *quid pro quo* can be inferred from (1) Benjamin securing the grant with the intent that it could yield a reward from Migdol and (2) Migdol interpreting Benjamin's action as a down-payment on future campaign contributions, in combination with (3) Benjamin "reminding" Migdol of the grant as a cudgel to drive Migdol to procure more donations.  But as explained above, *Evans* does not supply the governing legal standard here.  *McCormick* requires an agreement that is clear and unambiguous and in turn controls the action.  It does not permit the action to serve as proof of the agreement.

The government next stresses that the Indictment does not — and need not — contain all of the evidence it will present at trial.  (*E.g.* Dkt. No. 64 at 37.)  Benjamin makes much of the government's choice to present the grand jury with a speaking indictment containing a high degree of factual detail, contending that it is appropriate for the Court to consider those facts in determining the validity of the Indictment.  (*E.g.* Dkt. No. 60 at 5; Dkt. No. 64 at 19).  While the government is certainly correct that an indictment need not divulge the bulk of its evidence, the Court is permitted to consider whether the facts, as alleged on the face of the indictment, satisfy the statutory definition of a crime.  *See Aleynikov*, 676 F.3d at 76-82.  For example, in *United States v. Alfonso*, the district court dismissed the first count of the indictment because it failed to satisfy the elements of the Hobbs Act that permitted the federal court to exercise jurisdiction, namely a nexus to interstate commerce.  143 F.3d 772, 774 (2d Cir. 1998).  The Second Circuit reversed, warning:

> To the extent that the district court looked beyond the face of the indictment and drew inferences as to the proof that would be introduced by the government at trial to satisfy the Hobbs Act's jurisdictional element . . . such an inquiry into the sufficiency of the evidence was premature.  Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy the jurisdictional element of the offense, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.

*Id.* at 776–77.  Here, in contrast, the Court need not look beyond the face of the Indictment or take any inferential steps to conclude that the facts alleged in the indictment do not allege a violation of the given statutes, as modified by *McCormick*.  Further, the indictment here is substantively different from the indictment in *Alfonso*.  There, the indictment did not plead specific facts about the defendants' conduct, instead alleging in "conclusory terms" that defendants had violated Hobbs Act.  *Id.* at 776.  Here, the

Indictment recites fourteen pages of factual allegations, drawing a clear picture of the government's theory about the allegedly illegal agreement between Benjamin and Migdol. While the government has every right to present more evidence at trial, the Court can "fairly . . . describe" the Indictment as something much closer to a "full proffer" than the indictment at issue in *Alfonso*.

The government also attempts to locate a sufficient showing of an agreement in the fact that Benjamin retained the power to alter or retract the grant from Organization-1. (Dkt. No. 18 ¶ 23; Dkt. No. 64 at 25). But this permits, at best, an inference about Benjamin's state of mind. It does not show a clear, controlling agreement between him and Migdol, at least because the Indictment does not allege that Migdol was aware that Benjamin had any power to alter the grant.

Because the facts alleged in Counts One, Two, and Three of the Indictment do not constitute an offense under *McCormick*, those counts must be dismissed.

## IV.   Counts Four and Five

Benjamin also moves to dismiss Counts Four and Five, which both charge him with knowingly making a false entry in a record with the intent to impede an investigation under 18 U.S.C § 1519.[11] He argues that even if all the factual allegations in the Indictment are assumed true, the government has failed to allege a violation of § 1519. (Dkt. No. 53 at 34; Dkt. No. 60 at

---

[11] "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both." 18 U.S.C. § 1519.

32.)  Alternatively, he contends that "the government has charged § 1519 in a manner that is so attenuated that it is unconstitutionally vague and improper."  (*Id.*)

Benjamin's first argument is based on the following logic:  because "the Indictment fails to allege that Mr. Benjamin committed bribery in the first place, it alleges no basis for the claim that Mr. Benjamin believed he was committing bribery, much less that he contemplated or knowingly intended to obstruct a potential future investigation into a non-existent bribery scheme under § 1519."  (Dkt. No. 53 at 34.)  Defendant's logic assumes that the validity of Counts Four and Five cannot be assessed independently of the validity of the first three counts. That is not the case.  In *United States v. Baldeo*, the defendant argued that the court should enter a judgment of acquittal because he was "acquitted of the crime charged, but convicted of seeking to obstruct the investigation of the crime he never committed."  No. 13 Crim. 125 (PAC), 2014 WL 6807833, at *2 (S.D.N.Y. Dec. 3, 2014).  The court rejected this argument because the obstruction conviction stood on its own:  "A conviction of obstructing justice by impeding an investigation does not require that the investigation itself lead to a conviction; rather, an obstruction charge has its own elements, elements which the jury found to exist based on the evidence presented."  *Id.*  Though this case is at the pre-trial stage, the same logic applies:  a § 1519 charge has its own elements that the government is required to charge in the indictment.[12]

To that point, the Indictment properly charged the § 1519 violations by tracking the language of the statute and stating the time and place of the alleged crimes.  *Dawkins*, 999 F.3d at 779.  (*See* Dkt. No. 18 ¶¶ 42-44.)  Unlike the bribery and honest services fraud statutes, for which *McCormick* imposed an implicit and essential element in the context of campaign

---

[12] Benjamin notes that *Baldeo* is distinguishable on its facts because the defendant was aware of an ongoing FBI investigation when he obstructed justice.  (Dkt. No. # at 33.)  That may be true, but the court's legal analysis and conclusion in *Baldeo* are instructive by analogy.

contribution cases, the obstruction statute does not contain any such implicit elements.  Simply alleging the statutory elements is sufficient.

Nor does the Court find merit in the Benjamin's assertion that granting the motion to dismiss as to Counts One, Two, and Three while denying it as to Counts Four and Five would "permit an unprecedented application of the statute beyond the limits of due process."  (Dkt. No. 53 at 39.)  Due process is satisfied by adhering to the basic rule from *Dawkins*.  The government alleges two discrete acts involving Benjamin's knowing provision of false information: (1) when Benjamin "directed" Migdol to fill out the contribution forms in the names of two relatives (Dkt. No. 18 ¶ 19), and (2) when he represented that he had never "directly exercised [his] governmental authority . . . concerning a matter of a donor [he] directly solicited," even though he had solicited donations from Migdol before procuring the grant.  (*Id.* ¶¶ 20-21.)  The Indictment also provides an approximate time and place for both and states that these matters were within the jurisdiction of the Department of Justice.  (*Id.* ¶¶ 42, 44.)

Benjamin's most forceful point is that he could not have contemplated any federal investigation because his conduct, as alleged, did not constitute bribery.  To be sure, this Court's analysis and conclusions resulting in the dismissal of Counts One through Three buttress the *plausibility* of an argument that Benjamin was not contemplating a federal bribery investigation.  But that is ultimately an issue for the jury.  It does not follow from this Court's conclusion that the Indictment fails to charge a crime that Benjamin *could not have contemplated* a criminal investigation.  Because Counts Four and Five allege the necessary elements of the crime, those counts are legally sufficient.

As to Benjamin's second argument, that the government charged § 1519 in a manner that is unconstitutionally vague and improper, the Court is not persuaded.  Benjamin relies on *United*

*States v. Scott*, 979 F.3d 986 (2020), for the proposition that § 1519 must be interpreted to require that a defendant "knowingly act with the intent to impede an investigation" to avoid being void for vagueness.  (Dkt. No. 53 at 37 (citing *Scott*, 979 F.3d at 993)).  But at this stage in the proceedings, the Court is not examining the weight of the evidence on the knowledge requirement — the Indictment properly alleges knowledge as one of the statutory elements in Counts Four and Five.  Instead, the relevant lesson from *Scott* is that § 1519 does not require a nexus between the defendant's obstructive act and a specific pending or reasonably foreseeable proceeding:  "§ 1519 makes no reference to a concrete proceeding."  *Id.* at 992 (contrasting § 1519 with the nexus requirement in 26 U.S.C. § 7212(a)).  Benjamin counters that while § 1519 does not require a nexus, its application is still constrained because it requires a "demonstrable connection" to a federal investigation, "whether past, present, or future."  (Dkt. No. 53 at 38.)  This is belied by the *Scott* decision, which held that § 1519 does not require a concrete proceeding to be on the horizon.

## V.       Benjamin's Requests for Additional Discovery and a Bill of Particulars

Benjamin requests that the Court order the government to provide further discovery about the events leading up to Migdol's plea allocution, arguing that these materials "go to the heart of Mr. Benjamin's defense that there was no explicit *quid pro quo* (or any *quid pro quo* at all)." (Dkt. No. 53 at 64.)  Because the three counts of the indictment that rest on the existence of a *quid pro quo* have been dismissed, this request is denied as moot.

Alternatively, even if the requested material could be viewed as relevant to Counts Four and Five, Benjamin's request is still denied.  While *Brady* requires that the government disclose all evidence materially favorable to the accused, it does not permit a "broad and blind fishing expedition" into the government's files.  *United States v. Delacruz*, No. 14 Crim. 815 (KBF), 2015 WL 2211943, at *1 (S.D.N.Y. May 12, 2015).  The crux of Benjamin's complaint is that

the government has failed to explain the specific "inaccuracies" in the original draft of Migdol's allocution that led to the creation of the subsequent draft.  The prosecution has already produced the initial and revised plea allocutions, in addition to a written account of the prosecution's exchanges with Migdol's counsel on the eve of the plea.  (Dkt. No. 54 at 55.)  And the prosecution has represented that it is unaware of any undisclosed emails or notes between it and Migdol's counsel regarding the allocution.  (*Id.* at 59.)

Finally, Defendant moves for a bill of particulars identifying (1) all known co-conspirators and (2) all other alleged bribes and official acts, both in relation to Count One. Because Count One has been dismissed, this request is also denied as moot.

## VI.    Conclusion

For the foregoing reasons, Defendant's motion to dismiss the indictment is granted as to Counts One, Two, and Three, and denied as to Counts Four and Five.

Defendant's requests for additional discovery and a bill of particulars are denied as moot.

The Clerk of Court is directed to close the motions at Docket Numbers 48 and 51.

SO ORDERED.


Dated: December 5, 2022
          New York, New York

          J. PAUL OETKEN
          United States District Judge